## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **CHARIELL GLAZE,**<br><br>    *Plaintiff,*<br><br>vs.<br><br>**CUYAHOGA COUNTY,** *ET AL.*<br><br>    *Defendants.* | Case No. 1:19-cv-2969<br><br>Judge Donald C. Nugent<br><br>Magistrate Judge William H. Baughman, Jr. |
| **SECOND AMENDED COMPLAINT WITH JURY DEMAND** | |

### NATURE OF THE ACTION

1.  This is a civil-rights action to redress an act of torture perpetrated by two corrections officers who pepper sprayed, restrained, and physically abused Chariell Glaze without justification, and to hold Cuyahoga County accountable for adopting a custom, policy, or practice of brutalizing incarcerated citizens, failing to properly train its employees, and coddling the corrections officers who perpetrate sadistic violent acts against the people in their custody.

### PARTIES

2.  Plaintiff Chariell Glaze is a resident of Trumbull County. He is an African-American male. At all times relevant, Mr. Glaze was held in the Cuyahoga County Corrections Center ("the county jail" or "the jail").

3.  Defendant Cuyahoga County is an Ohio political subdivision responsible for the county jail.

4.  Defendant Damein Bodeker is a sergeant with the jail. He is white. He has worked at the jail since 2012. At all times relevant he was in uniform and acting under color of state law. At the time of the incident, he was a corporal. He has since been promoted.

5.      Defendant Deleonte Brown is a corrections officer with the jail. He is African-American. At all times relevant he was in uniform and acting under color of state law.

## Jurisdiction and Venue

6.      The Court has jurisdiction because Defendants removed this case to this Court based on federal-question jurisdiction.

7.      The Court has personal jurisdiction over Defendants, who are located, work, and/or reside in this jurisdiction. Venue is proper here because the events giving rise to Mr. Glaze's claims took place in this jurisdiction.

## Factual Background

8.      On November 27, 2017, Mr. Glaze was scheduled to be released from the jail. His Cuyahoga County Sheriff's Office Booking/Release Card clearly lists his scheduled release date as "11-27-17" in large red letters. This correctly reflects his 90-day sentence entered on October 16, 2017 with credit for 48 days served. Both the court docket and the jail's own records indicate that Mr. Glaze was to be released on November 27, 2017.

9.      During breakfast rounds on his scheduled release date, Mr. Glaze asked the night-shift officer who supervised breakfast delivery to check on the status of his release paperwork. Mr. Glaze showed the officer the journal entry regarding his jail term. The officer told Mr. Glaze that his shift was ending, so he could not call booking himself, but that he would leave a message about it for the floor officer on the next shift.

10.      Around 8:40 a.m., Mr. Glaze and the other incarcerated citizens on his pod were finally permitted to leave their cells for the first time that day as they had been on red zone.

11.      Mr. Glaze asked the floor officer on the new shift, Defendant Deleonte Brown, about his scheduled release that day. Defendant Brown confirmed that he received the message from the officer on the previous shift and would "get in touch" with the booking department.

12.     Mr. Glaze's pod was then placed on red zone, forcing the men in the pod to return to their cells, despite having just been released from their cells for the first time that day. The jail's custom and practice for addressing its chronic problems of overcrowding and understaffing is red zoning, which places incarcerated citizens on mandatory in-cell time that can result in up to 23 hours of lock-up per day in general population. Mr. Glaze was confined to a one-man cell with another man. He was forced to sleep on the floor because there was only one bed and was forced to eat his meals beside the commode during red zoning.

13.     Mr. Glaze reasonably feared that the red zoning would delay his release. So, he pleaded with Defendant Brown to call the booking department. Defendant Brown dismissed Mr. Glaze's request.

14.     Standard procedure within the jail is that an incarcerated person has the right to request that a corporal respond to try to resolve an issue or concern with a corrections officer.

15.     Aware of his right to request that a corporal respond to address the situation, Mr. Glaze asked the floor officer to call the corporal. Mr. Glaze hoped that the corporal would contact the booking department to ensure an on-time release despite the red zone.

16.     The corporal, Defendant Bodeker, approached Mr. Glaze. Mr. Glaze presented the journal entry showing his November 27 release date and asked if Defendant Bodeker would check on the status of his release. Mr. Glaze complied with Defendant Bodeker's order to step into the vestibule between the pod and the elevators. Mr. Glaze posed no threat to himself or to others.

17.     The corporal did not attempt to resolve the situation peacefully. As Mr. Glaze asked about his scheduled release, Defendant Bodeker responded with a threat: "I should dump you and spray you right now."

18.     Defendant Bodeker initiated physical contact with Mr. Glaze while Mr. Glaze stood with his hands up in the air, grabbing him by the collar of his shirt and emptying a can of pepper foam into his face from an unsafe distance.

19.     The following image is a screen shot from the body-worn camera footage of the attack on Mr. Glaze. It shows Defendant Bodeker's gloved left hand gripping Mr. Glaze's shirt as the corporal's right hand sprays the pepper foam into Mr. Glaze's face:



20.     It is not appropriate to deploy pepper spray on a person who is not resisting and poses no threat or to deploy the spray from less than 3–4 feet.

21.     Upon information and belief, Defendants Bodeker and Brown were wearing body cameras throughout these interactions. Their body cameras were in "Buffering Mode," where it is continuously recording. Footage recorded in Buffering Mode is automatically deleted unless the camera is switched to "Event Mode," which causes the camera to save anything it records going forward, as well as the footage from the 30 seconds before entering Event Mode.

22.     Defendants Bodeker and Brown intentionally kept their cameras in Buffering Mode to ensure it destroyed footage of Defendant Bodeker attacking Mr. Glaze, or the events leading up to that attack or its aftermath.

23.     Defendant Bodeker's use of pepper foam to hurt Mr. Glaze is consistent with Defendant Cuyahoga County's custom, policy, pattern, and practice of using pepper spray to retaliate against and abuse inmates indiscriminately.

24.     Defendant Bodeker's use of pepper foam from less than 3–4 feet is consistent with Defendant Cuyahoga County's custom, policy, pattern, and practice of allowing its officers to deploy pepper foam from an unsafe distance.

25.     As he was spraying Mr. Glaze in the face with pepper foam from an unsafe distance, Defendant Bodeker also sprayed himself.

26.     The foam left Mr. Glaze unable to see. He was coughing and gasping for air.

27.     Defendants Bodeker and Brown then led Mr. Glaze from the vestibule into the hallway and intentionally walked him into a metal door. Mr. Glaze sustained a broken tooth and cuts to his face and lips. The pepper spray seeped into his fresh cuts, intensifying the already unbearable burn.

28.     Special Response Team ("SRT") officers respond to various incidents within the jail. They wear black paramilitary garb and are known for their proclivity for violence. Those incarcerated refer to SRT as the "Men in Black."

29.     On information and belief, Defendant Brown summoned SRT by radioing a report about an assault on an officer (even though Mr. Glaze had not assaulted anyone).

30.     SRT officers arrived and roughly strapped him into a restraint chair. They strapped him so tightly that he had belt marks on his waist hours after eventually being released from the chair.

31.     On information and belief, one or more SRT officers were wearing body cameras throughout the time that Mr. Glaze was strapped in the restraint chair. Their body cameras were in "Buffering Mode," where it is continuously recording.

32.     The SRT officers intentionally kept their cameras in Buffering Mode to ensure it destroyed any footage of the events that occurred while Mr. Glaze was strapped in the restraint chair, including the intentionally ineffective "decontamination" from the pepper spray.

33.     SRT officers mocked Mr. Glaze as he sat strapped into a restraint chair, laughing about how the other officers "got you real good" and asking, "how hot is it?" as Mr. Glaze gasped for air.

34.     The SRT officers' amusement at Mr. Glaze's agony underscores how accustomed jail personnel are to seeing unnecessary human suffering. Their callousness results from the County's custom, policy, pattern, and practice of permitting corrections staff to use unjustified and unnecessary force on the people in custody without any real consequences.

35.     The foam's burning on Mr. Glaze's face, lips, and inside his mouth continued to worsen as he sat in the restraint chair. He tilted his head down towards his chest and tried to spit the foam from his mouth onto his own shirt.

36.     SRT officers yelled with laughter that they "got a spitter!" and placed Mr. Glaze in a face mask. Mr. Glaze could barely breathe as it was from the pepper spray; the face mask further exacerbated his pain and difficulty breathing.

37.     SRT officers ineffectively decontaminated Mr. Glaze to purposefully prolong his suffering from the pepper spray's effects. In a closet referred to as the "slop room," SRT officers spritzed Mr. Glaze with hose water for only a few seconds, which did not remove the residue from his skin.

38.     Washing the skin with soap or some other cleaning solution is the appropriate way to effectively decontaminate someone who has pepper spray on the skin.

39.     Jail staff failed to use any soap or other cleaning solution to remove the residue from Mr. Glaze's skin.

40.     Defendant Bodeker, however, was given a cleaning solution to remove the foam from his own skin.

41.     As he was being transported in the restraint chair, Mr. Glaze asked jail staff to let him use the restroom. The staff refused.

42.     Mr. Glaze was taken to the wait room, where he remained in the restraint chair for approximately three hours without water, a shower, new clothes, or access to a restroom, despite being fully compliant and there being no reason to keep him tied to a chair.

43.     When officers would pass by for the required "checks," Mr. Glaze repeatedly begged them to loosen the straps on the restraint chair and let him use the restroom. They refused. Mr. Glaze eventually urinated on himself. Mr. Glaze sat in the chair in the frigid isolated observation room, crying, drenched in pepper foam and urine. The officers told Mr. Glaze that "the more noise you make, the longer you'll be in here."

44.     After approximately three hours, Mr. Glaze was wheeled from the isolation room and into a segregation cell where he was released from the chair and remained for the next three days.

45.     For these three days following the attack on Mr. Glaze, jail staff did not permit him to shower. Staff also denied him soap, clean clothing, and clean bedding. Mr. Glaze tried unsuccessfully to use the sink in his segregation cell to clean the urine and pepper spray from his body and clothes.

46.     Jail staff then moved Mr. Glaze to disciplinary isolation for five days. Inmates refer to this area of the jail as "bologna island." While there, Mr. Glaze's diet was restricted to bologna sandwiches, carrots, an old orange, spoiled milk, and foul-smelling oatmeal. All Mr. Glaze had done was ask jail staff to contact booking about his release. He did nothing to deserve the treatment he endured.

47.     The Cuyahoga County jail has a custom, policy, and practice of physically punishing incarcerated citizens without just cause to use force. The Cuyahoga County jail has a custom, policy, and practice of evading information requests from the public, as well. Mr. Glaze files this lawsuit to demand that the defendants compensate him for the brutal attack he suffered while incarcerated in the jail.

48.     Mr. Glaze finally left the jail on December 7, 2017. Officials from Arkansas transported him from the jail to Arkansas because Mr. Glaze had an outstanding warrant for an alleged parole violation. Jail personnel neglected to inform Mr. Glaze of this fact before attacking him on November 27, 2017. Had they treated him like a human being and explained the situation, he would have had no reason to continue to ask them to call booking about his scheduled release (not that asking someone to make a phone call is grounds to initiate a beat down on an otherwise compliant and non-threatening individual).

49.     Mr. Glaze has experienced symptoms of post-traumatic stress disorder since he was mistreated at the jail.

50.     After his release, Mr. Glaze complained to the Defendant County regarding the treatment he endured by submitting a complaint to the Warden's Office. No one responded to him.

**The County refuses to produce complete surveillance video footage of the attack.**

51.     The County has motion-activated surveillance cameras throughout the jail.

52.     Mr. Glaze, through counsel, requested public records regarding the abuse he endured, including surveillance and body-worn camera footage of the attack and its aftermath.

53.     The jail produced no surveillance video from the many camera angles that would have captured Mr. Glaze's attack, his confinement to a restraint chair, or his transport to "decontamination" and medical then to the wait room and a segregation cell. Dozens of motion-activated surveillance cameras throughout the jail would have captured each of the relevant events. The County destroyed all of the surveillance video of Mr. Glaze that was captured on the many surveillance cameras in the jail.

54.     The jail produced just two body-worn camera videos of Mr. Glaze: a snippet of a video that ends abruptly just after Mr. Glaze is pepper foamed (and does not depict his confinement to the restraint chair, "decontamination," or transport to medical and the wait room) and a single body-worn camera video of his release from the restraint chair hours later. There should have been much more body-worn camera footage including footage documenting the full interaction between Mr. Glaze and Defendant Bodeker before the attack, the Defendants slamming Mr. Glaze into the metal door, confining him to the restraint chair, transporting him to the slop room for "decontamination," the SRT officers mocking him and pulling a spit mask over his head to exacerbate his suffering, transporting him to medical, and wheeling him to the wait room on the seventh floor. Yet only the two body-worn camera videos of Mr. Glaze exist. The County destroyed or permitted the destruction of all of the other body-worn camera video of Mr. Glaze that was captured on the devices worn by the various officers in his presence that day.

55.     The County claims it has no additional footage of Mr. Glaze.

56.     On information and belief, the video showing a portion of the attack on Mr. Glaze was tampered with or altered by someone with access to the videos.

57.     The County permitted Defendant Bodeker, Defendant Brown, and SRT officers the discretion to determine whether to record audio and video of the interaction with Mr. Glaze.

58.     On information and belief, corrections personnel at the jail regularly fail to activate their body-worn cameras, preventing the preservation of audio and video evidence of their interactions with inmates. The County generally does nothing to address or curtail these rampant violations of its written policy. No one was disciplined for failing to record any aspect of the events at issue in this matter.

59.     The failure to preserve complete video evidence of Mr. Glaze's abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff inflict at the jail.

### The County disciplines Defendant Bodeker for making a racist remark and then subsequently promotes him.

60.     On March 1, 2019, Defendant County issued Defendant Bodeker a written reprimand for making a racist remark about a supervisor; he called a black male sergeant a "monkey ass" in front of subordinates.

61.     A few months after he received the written reprimand for the racist remark, Defendant County promoted Defendant Bodeker from corporal to sergeant.

### Former Warden Eric Ivey and Former Director of Regional Corrections are indicted and Ivey pleads guilty.

62.     Former-Warden Eric Ivey was indicted and pleaded guilty to obstruction of justice and falsification related to the performance of his duties at the jail. He was first demoted then resigned from his position.

63.     The former director of regional corrections, Kenneth Mills, resigned from his position in November of 2018 just before the release of a scathing U.S. Marshals Service Report regarding deplorable conditions at the jail. Mr. Mills was later indicted on charges related to the performance of his duties at the jail including tampering with records, falsification, and dereliction of duty for making the jail unsafe by failing to provide adequate food, clothing, bedding, shelter, and medical attention. He remains under indictment.

### OTHER INCIDENTS RESULTING FROM THE MALICIOUS, BAD-FAITH, WANTON, AND RECKLESS EXERCISE OF DISCRETION AT THE COUNTY JAIL

64.     In addition to the above-described treatment of Mr. Glaze, other corrections staff, as part of a custom, policy, pattern, and practice, have perpetrated many additional unprovoked and unwarranted acts of violence on the people incarcerated in the jail along with other constitutional-rights violations. Some of those acts are described in the following paragraphs.

65.     Also detailed are various instances where the County has failed to maintain complete and accurate public records documenting the abuse perpetrated by corrections staff through destruction or tampering with public records such as videos depicting abuse.

### A corrections officer attacked Lucille Dumas while she was confined to a restraint chair, breaking a Tupperware container over her head.

66.     On January 14, 2015, Lucille Dumas was booked into the Euclid Jail—then operated by Defendant Cuyahoga County—after a traffic stop. During the booking process, Corporal Madeline Chappell punched Ms. Dumas in the face.

67.     When Ms. Dumas stood up to take a defensive posture, several officers threw her to the ground. One of the officers kicked her while she was on the ground, and Chappell sprayed her with pepper spray. An officer then lifted Ms. Dumas off the floor by her hair and threw her into a restraint chair.

68.     After the officers strapped Ms. Dumas into the chair, Corporal Chappell fixed her own hair and then began punching Ms. Dumas in the face. Another officer rolled Ms. Dumas into an area out of sight of surveillance cameras, where Chappell beat her with a Tupperware container, using enough force to shatter the container.

69.     Corporal Chappell ordered officers to throw away evidence of her attack, delete information from their reports of the incident, and sign false statements about what happened.

70.     Corporal Chappell had already been disciplined dozens of times before this attack. She was only able to carry out her attack on Ms. Dumas because the County failed to properly discipline her for unprofessional conduct.

71.     The treatment Ms. Dumas endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

### A corrections officer smashed Joshua Castleberry's teeth into his nose over a dispute about a bologna sandwich.

72.     On February 5, 2018, Joshua Castleberry was in the county jail. Following a dispute over a bologna sandwich, officer John Wilson savagely smashed a handcuffed Mr. Castleberry's face into the floor so violently that his teeth were broken (with one tooth pushed all the way up into his nasal cavity). At least one other officer—Corporal Brandon Honaker—witnessed this attack but did not report it to law enforcement. Corrections staff placed Mr. Castleberry in a restraint chair and jammed a mask over his broken face to conceal the assault from medical staff.

73.     At the time, Ken Mills was the administrator of the jail. (As detailed above, Mills has since resigned and been indicted based on his jail-related conduct.) His officers refused to let nursing staff remove the mask to assess Mr. Castleberry's injuries, but a night nurse saw Mr.

Castleberry and requested medical evaluation. The security supervisor refused, saying: "He wants to try and hit one of my officers — he can sit the fuck there for hours."

74.     The night nurse called the nursing supervisor — Gary Brack, R.N. — at home, reporting a serious medical emergency. Nurse Brack called the staff sergeant in charge and demanded a medical evaluation, but the Defendant County waited another half-hour before transporting Mr. Castleberry to medical. The mask was lifted, EMS was called, and Mr. Castleberry was transported to the hospital for surgery to remove the tooth from his nasal cavity and reconstruct his face.

75.     The next day at the monthly sheriff's meeting, Mills covered up the abuse. When asked about the incident, Mills stated: "I reviewed the situation and the officers used appropriate force to the threat of what the inmate was using." Medical Director Dr. Thomas Tallman asked to view the security footage, but Mills refused, saying: "I already reviewed it — nothing was done wrong." (Dr. Tallman has since been removed as the jail's medical director.)

76.     Former Sheriff Clifford Pinkney stated that he would follow up with the incident, but when he went to review the footage, the security and body-camera footage had somehow "disappeared."

77.     Wilson was indicted for felonious assault in the second degree and misdemeanor charges of interfering with civil rights and unlawful restraint. Corporal Jason Jozwiak was charged with unlawful restraint and interfering with civil rights related to denying Mr. Castleberry medical care. Jozwiak was acquitted but the result was a hung jury on the charges against Wilson for felonious assault and interfering with civil rights. On February 19, 2020, Wilson pleaded guilty to a reduced charge of assault. He remains a jail employee.

78.     During the trial, FBI agent Dennis Timony testified that his investigation revealed evidence that jail videos had been tampered with through deletion and other means. That

explains why there was no video of Wilson attacking Mr. Castleberry for the sheriff to review or the jury in the criminal case to see. And it reveals serious flaws in the County's security and records-management protocols.

79.     No one was held accountable for what happened to Mr. Castleberry.

80.     No one was held accountable for the missing video footage.

81.     The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

82.     The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records that document the abuse corrections staff are perpetrating at the jail.

### Corrections officer Darriell Hayes chokes Glenn Mayer, Jr. for twitching while receiving his medication for a neurological condition that causes muscle spasms and twitching.

83.     In August 2018, Mr. Mayer was booked into the jail. He was assigned to the medical housing unit, which was designed for people who, like him, have serious medical conditions. His podmates in the eight-man pod called him "Twitch" in reference to his pronounced tremors.

84.     Each day, Mr. Mayer received certain medication from a nurse to treat his condition (though the County did not provide him with all his prescribed medications). Mr. Mayer had established a rapport with most of the medical staff and with corrections officer Shaw who was typically assigned to the unit.

85.     On October 16, 2018, during the second pill call, corrections officer Darriell Hayes was assigned to substitute for Shaw. Defendant Hayes displayed a callous disregard for the well-being of those housed in the medical unit. Before the attack on Mr. Mayer, Defendant Hayes

prevented a disabled inmate from stepping out of the cell, hollering: "I don't care about medical issues. I'm treating this like a regular pod. I'll still put you on the ground."

86.     Defendant Hayes accompanied Nurse Heather Johnson in her routine distribution of medicine. Her first stop was Mr. Mayer's cell. He stepped out of his cell to get his medicine.

87.     Because of Mr. Mayer's medical condition, nurses must hold his hand still to dispense his medication.

88.     As Nurse Johnson placed the medicine in Mr. Mayer's hand, it twitched slightly. Defendant Hayes grabbed Mr. Mayer from behind by the neck and squeezed hard. This aggression triggered an intense muscle spasm. His pills went flying. Defendant Hayes, with one hand still gripping Mr. Mayer's neck, slammed his opposite elbow into Mr. Mayer's back while yanking back on his neck. The spasms continued as Defendant Hayes continued to manhandle Mr. Mayer, squeezing his neck hard.

89.     Nurse Johnson eventually told Defendant Hayes to let Mr. Mayer go and explained his condition. Defendant Hayes did not immediately release Mr. Mayer despite what the nurse explained. Defendant Hayes replied, "I'm not used to this, I'm used to choking people out when things like this happen." Defendant Hayes eventually released Mr. Mayer.

90.     Even after releasing Mr. Mayer's neck, Defendant Hayes continued to torment him, insisting on performing multiple mouth-checks (where an officer observes the inside of a patient's mouth to confirm that he swallowed his pills) while Mr. Mayer, shaken from the attack, twitched erratically. Defendant Hayes did not relent until Nurse Johnson told him that was enough and to leave Mr. Mayer alone. He returned to the safety of his cell and another man went out to get his medicine from the nurse. Outside the cell, Mr. Mayer could hear Defendant Hayes continuing to run his mouth about how he was used to "laying people out" and otherwise carrying on for the nurse as she attended to other patients.

91.     After Defendant Hayes's attack on him, Mr. Mayer experienced pain and discomfort. Though he initially retained his ability to walk, his physical condition deteriorated progressively. Over the coming days, he experienced tingling and intermittent loss of mobility of his body, which at times manifested as near-total paralysis requiring the use of a wheelchair (such as when he collapsed in his cell two days after the attack and for an extended period thereafter). He continues to experience the effects of Defendant Hayes's brutalization and still requires the use of a walker for mobility for persistent left-sided weakness and loss of muscle control. Mr. Mayer's twitching has increased since the attack.

92.     Upon the dispatch of medical emergency personnel following Mr. Mayer's collapse, a Special Response Team officer's body-worn camera footage showed another officer—Toney— directing the SRT officer to turn off his body-worn camera. The officer complied and cut short the recording of Mr. Mayer's agony on that day.

93.     The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

94.     The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records that document the abuse corrections staff are perpetrating at the jail.

**Corrections officers emptied a can of pepper spray in Chantelle Glass's face while she was confined in a restraint chair and failed to decontaminate her to prolong her agony.**

95.     Chantelle Glass was booked into the county jail on July 16, 2018 after police discovered a warrant stemming from an outstanding traffic ticket.

96.     Ms. Glass—a mother of three small children—requested a phone call so that she could inform her family of her arrest and contact an attorney. The guards repeatedly refused Ms.

Glass's request even though anyone who watches Law & Order knows that everyone under arrest is entitled to a phone call.

1.  When Ms. Glass persisted in her request after being placed in a holding cell, corrections officers threatened that if she did not stop, they would tie her down and "mace" her. Ms. Glass continued to request her phone call, and officers called Corporal Idris-Farid Clark, a supervisory officer, who, along with corrections officer Robert Marsh, made good on that threat.

97.  The Defendant County knew that Marsh had a propensity for hitting restrained inmates in the head. Marsh's supervisor had caught him hitting a restrained inmate (Sean Panoroski) in the face as he was being restrained several years earlier. And just weeks before the attack on Ms. Glass, Marsh punched an inmate in the face during the booking process without any consequence.

98.  At Clark's request, Marsh retrieved a restraint chair. Video surveillance shows Clark remove his can of pepper spray from his tactical vest, shake it, and return it to his vest pocket before Ms. Glass was even brought out of her cell.

99.  Ms. Glass cooperated as officers escorted her out of her cell in handcuffs and strapped her into a restraint chair. As Marsh continued tightening the restraints, Clark again took out his pepper spray and again shook the canister.

100.  When Marsh reached between Ms. Glass's knees, she instinctually drew her legs together out of fear. She made no other movements. Ms. Glass—strapped into the restraint chair—could not pose any threat to the officers.

101.  Rather than step back when Ms. Glass flinched, Marsh stepped towards Ms. Glass and punched her in the head. She flailed in her restraints, trying in vain to protect herself.

102.  Corporal Clark then stepped towards Ms. Glass to make good on his colleague's threat to "mace" Ms. Glass. He emptied an entire canister of pepper spray onto Ms. Glass's face from an

unsafe distance. Ms. Glass tried to turn her head to avoid the spray, but Mr. Clark grabbed her

hair to hold her head still while deploying the pepper spray inches from her eyes.

103.     When the attack concluded, Ms. Glass asked Clark: "Why did you mace me?" He

responded: "Because you talk too much."

104.     Rather than providing Ms. Glass with prompt and adequate medical care, the officers

wheeled her to a utility closet referred to as a "slop room." Minutes passed before officers began

"decontamination" by thrice spritzing Ms. Glass's face and the top of her head with water. This

did not effectively decontaminate Ms. Glass (nor was it intended to). Pepper spray still covered

her face, neck, and chest after the "decontamination" concluded, which was intended to (and

did) prolong her agony.

105.     Clark then wheeled Ms. Glass to the medical unit. Having access to medical personnel

did not improve matters given the medical staff's participation in the corrections officers'

deliberate indifference to and apparent enjoyment of Ms. Glass's agony. The sole "medical care"

provided by Nurse Diane Lessmann was dabbing Ms. Glass's eyes with one piece of gauze. This

nurse did not explain to Ms. Glass what was happening to her and did not display any

compassion for her pain. Ms. Glass writhed in pain begging for help, saying she could not

breathe, and referencing her asthma condition. No one seemed to care. Indeed, all jail personnel

who witnessed what happened to Ms. Glass seemed entirely unmoved by the events. No one

intervened to curtail the wildly excessive use of force or to insist that she be properly

decontaminated.

106.     When Ms. Glass left the medical unit, pepper spray was still visible on her face, neck, and

chest. Ms. Glass was placed alone in an isolation cell still restrained and covered in pepper spray

for over two hours, and denied access to food, water, and the opportunity to use the restroom

facilities.

107.    For her entire 48-hour stay in the jail, corrections staff denied Ms. Glass's requests to shower.

108.    For her entire 48-hour stay in the jail, Ms. Glass remained in the same clothing contaminated with pepper spray and urine.

109.    Ms. Glass was released on July 18, 2018 after New Jersey officials confirmed that they did not want her extradited on the old warrant.

110.    On April 24, 2019, Ms. Glass requested public-records video footage of her incarceration, but the County did not provide all footage that should exist, including any body-worn camera footage during the assault/pepper spray incident, or any videos of her intake at the jail, or any videos of her return to her cell after being released from the restraint chair, or any videos of her exit from her cell and being processed out and released. This is because the Defendant County had perpetrated a mass deletion of public records—specifically jail surveillance footage—without authorization of a records-retention schedule. Records that should have been provided in response to Ms. Glass's April 24, 2019 public-records request had been destroyed in violation of Ohio law.

111.    Defendants Idris-Farid Clark and Robert Marsh were indicted for attacking Ms. Glass.

112.    Defendant Marsh pleaded guilty to assault for his attack on Ms. Glass.

113.    Defendant Clark pleaded guilty to attempted felonious assault and unlawful restraint for his attack on Ms. Glass. He also pleaded guilty to extortion for trying to blackmail other corrections officers to testify for him by threatening to release videos of them engaged in use-of-force incidents.

114.    None of the other corrections officers who watched the attack and failed to intervene have been held accountable.

115.    No one was held accountable for the missing video footage.

116.     The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

117.     The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

### Blanche Hill endured a 12-hour confinement to a restraint chair with no restroom access.

118.     Also, in July 2018, Blanche Hill was booked into the county jail.

119.     Without any legitimate reason to do so, jail staff confined Ms. Hill to a restraint chair for many hours and denied her food, water, and the opportunity to use the restroom facilities.

120.     The jail held no one accountable.

121.     Ms. Hill requested video footage of her ordeal. Other than a single 32-second snippet from a body-worn camera (showing her already confined to the restraint chair), the jail has produced no video—from wall-mounted surveillance or body-worn cameras—documenting what she endured or why she was restrained at all.

122.     No one was held accountable for the missing video footage.

123.     The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

124.     The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

**Corrections personnel brutally attacked Corrionne Lawrence without provocation, used racial slurs, and threatened to kill him and "make it look like a suicide."**

125.    On September 16, 2018, Corrionne Lawrence was booked into the jail. He spent approximately four hours confined in a restraint chair as a punishment for speaking Spanish during the booking process. The responsible corrections officer failed to prepare and submit the required report documenting this use of the restraint chair. And the County destroyed the video footage of this use of the restraint chair.

126.    Before being assigned to a pod, Mr. Lawrence alerted corrections staff that he had to be kept separate from Stacey Norris, who was in the jail on charges that he murdered Mr. Lawrence's cousin.

127.    Though initially housing them separately, the jail relocated Mr. Lawrence to Mr. Norris's pod approximately one month later. As Mr. Lawrence was brought into his new pod, Mr. Norris threatened Mr. Lawrence in the presence of corrections officers. Corrections staff then allowed Mr. Norris to attack Mr. Lawrence in his cell.

128.    Mr. Lawrence sustained no visible injuries in the Norris attack, but was taken to medical per protocol and was then released from medical.

129.    While Corporal Christopher Little escorted a handcuffed Mr. Lawrence from the infirmary to his new cell in disciplinary isolation, Little told Mr. Lawrence to step to the back of the elevator and face the wall. Mr. Lawrence complied and Little stated: "Let's play a game." Little then repeatedly punched Mr. Lawrence in the side of his face, punched and kicked him while he was on the floor, called him a "n*****," and threatened him if he did not keep his mouth shut. Corporal Honaker witnessed this attack, but did not stop it or report it.

130.    Mr. Lawrence asked another employee, Brandon Smith, if he could go to the nurse and Smith laughed in Mr. Lawrence's face.

131.    While still in isolation, a corrections officer threatened to mace Mr. Lawrence and told him "N**** I will kill you, hang you, and make it look like a suicide" when Mr. Lawrence asked for a shower. Over the past year, at least nine people incarcerated in the jail died, including as a result of apparent suicide by hanging.

132.    Mr. Lawrence spent 12 days in isolation. Mr. Lawrence was interviewed repeatedly by the United States Marshals Service. During his interview, Mr. Lawrence revealed to the Marshals that he had been assaulted and threatened by Little.

133.    Smith escorted Mr. Lawrence from the interview and said: "Why you snitching? You a snitch now. Trying to get my boy indicted."

134.    The Marshals Service eventually demanded that the County transfer Mr. Lawrence and others out of the jail given the threats by SRT staff. Mr. Lawrence was taken to Geauga County jail for his own protection.

135.    No one has been held accountable for attacking or threatening Mr. Lawrence.

136.    Despite his request for surveillance or body-worn camera footage of Corporal Little assaulting him in the elevator, Cuyahoga County has produced none (despite Corporal Little's insistence that Corporal Honaker's body-worn camera was activated).

137.    No one was held accountable for the missing video footage.

138.    Mr. Lawrence sued the County and corrections personnel Christopher Little, Brandon Smith, Barry Hickerson, and Beverly Witt. The matter settled for $140,000.

139.    The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

140.    The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

**Jail staff beat and pepper sprayed Joseph Sawyer in his wheelchair
for no reason.**

141.    In October 2018, Joseph Sawyer was booked into the jail. Mr. Sawyer was confined to a wheelchair due to a degenerative bone condition. Without any legitimate reason to do so, jail staff punched Mr. Sawyer in the face, pepper sprayed him, and strapped him into a restraint chair.

142.    Jail staff failed to effectively decontaminate Mr. Sawyer from the pepper spray and refused to permit him to shower or change clothes for more than a week. Jail staff also denied him the use of a wheelchair.

143.    The jail held no one accountable.

144.    Mr. Sawyer asked the County to provide the video of the attack, but the County has provided nothing, claiming that no video records exist of Mr. Sawyer on the day of the attack.

145.    No one was held accountable for the missing video footage.

146.    The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

147.    The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

### Corrections officer Brandon Smith violently shoved Timothy Bennett while he was receiving an injection from medical staff.

148. On approximately November 1, 2018—during the Marshal's investigation at the jail—corrections officer Brandon Smith attacked Timothy Bennett as he was receiving an injection from medical staff at the diabetic cart, pushing Mr. Bennett while the needle was inserted in his back.

149. On information and belief, Smith was written up for this violent outburst. Compared with the many, many times that corrections staff imposed punitive violence with no consequence, the isolated write up of Smith was an anomaly.

150. On information and belief, this stray instance of showing mild displeasure at an SRT officer hurting someone in custody was motivated by either the presence of medical staff during the incident or the ongoing federal investigation—about which Smith was furious.

151. The jail's own investigation into Smith's use of force against Mr. Bennett confirmed that just before Smith put his hands on Mr. Bennett at the diabetic cart that morning, Smith had called Mr. Bennett a "snitch" for speaking to federal investigators about jail conditions. Jail nurse Gwendolyn Bremer confirmed that Smith called Mr. Bennett a "snitch."

152. The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

### A corrections officer choked and dragged Tyrone Hipps, Jr. because he complained about being denied the opportunity to pray.

153. Tyrone Hipps, Jr. was booked into the county jail on June 22, 2018. He informed the officers that he is a Muslim and requested a no-pork diet.

154. Practicing Muslims must pray five times per day, facing east toward the holy city of Mecca.

155.    On November 3, 2018, Mr. Hipps was preparing to pray at the eastern end of his dormitory when corrections officer Christopher Perdue approached Mr. Hipps and told him to go to his bed area. Mr. Hipps explained that he was about to pray. Perdue said: "Pray by your bed." Mr. Hipps explained that praying by his bed was improper because he is required to pray facing the east with no one walking in front of him. Perdue then told Mr. Hipps to go pray in the day area. Mr. Hipps explained that praying in the day area would also be improper because people would still be in front of him while he was praying. Mr. Hipps tried to explain the importance of observing proper prayer protocols.

156.    In response to Mr. Hipps's explication of his religious custom, Perdue threatened to send Mr. Hipps to the hole. Consistent with the jail's practice of inmates having the right to request a corporal respond to resolve any issue or concern with a corrections officer, Mr. Hipps asked Perdue to get the corporal to resolve the issue. Perdue left, returned a few seconds later (without the corporal), and threatened: "I'm going to give you three chances to move, if you don't move by the third, I'm going to move you myself."

157.    Mr. Hipps complied with Perdue's command, picked up his prayer rug, and walked towards his bunk. He said: "This is my religion. I could sue you for this." Perdue responded: "I'll give you something to sue for." Perdue then grabbed Mr. Hipps and put him in a chokehold. Perdue dragged Mr. Hipps to the front of the pod, threw him on his face, and told him to stop resisting.

158.    Another officer had to physically remove Perdue from Mr. Hipps.

159.    Despite having done nothing wrong, Mr. Hipps spent the next five days in the hole.

160.    He remained in the hole for two days after an investigator visited Mr. Hipps in the hole and confirmed that the video showed he had done nothing wrong.

161.    Despite Perdue's vicious attack on Mr. Hipps, jail administration did not place Perdue on leave or even separate Perdue from Mr. Hipps. Perdue constantly taunted Mr. Hipps when he returned from the hole.

162.    No one has been held accountable for attacking Mr. Hipps.

163.    The video evidence of this attack that the County has provided in response to public-records requests by media and others excludes footage of part of the attack. The County can provide no explanation for this apparent tampering, and has not provided much of the surveillance video of Mr. Hipps's time in custody that should exist.

164.    No one was held accountable for the missing video footage.

165.    The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

166.    The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

### Corrections officer Charles Enoch attacked Jasper Muldrow for singing, putting him in a dangerous rear naked chokehold.

167.    On November 12, 2018, corrections officer Charles Enoch, who touts being "trained in ground fighting," used excessive and entirely unnecessary force against Jasper Muldrow, pushing and punching him before putting him in a rear naked chokehold. In Brazilian Jiu Jitzu, the move is called Mata-Leão, which means "lion killer."

168.    Other officers then pepper sprayed and strapped Mr. Muldrow into a restraint chair.

169.    Enoch attacked Mr. Muldrow because he was singing during the 20 minutes that he was allotted out of his cell each day.

170.    Mr. Muldrow suffered a broken wrist. The County did not transport him to the hospital to receive medical care for the broken bone until five days later.

171.    In explaining his use of the rear naked chokehold, Enoch asserted in a written statement that while "it would appear that inmate was being choked," "in actuality" he wasn't. Enoch explained that "according to doctors + MMA [mixed martial arts], and Ju Jitsu [*sic*] coaches when a 'choke hold' is applied correctly, the person being choked will lose consciousness with in [*sic*] 4 to 7 seconds." He essentially tried to excuse the attack because he failed to nail the move.

172.    The jail found that Enoch failed to attempt to disengage before using force, failed to document what had transpired, and used excessive force.

173.    Enoch is a 12-year veteran of the corrections staff. His behavior in attacking Mr. Muldrow is consistent with what Enoch understood to be something he could get away with based on how the jail had responded (or failed to respond) to use-of-force incidents in the past.

174.    The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

### A corrections officer emptied a can of pepper foam into Daniel Ford, Jr.'s face as he suffered a PTSD attack.

175.    In December 2018, Daniel Ford, Jr. was booked into the jail. Mr. Ford suffers from post-traumatic stress disorder. Corrections staff refused to provide his mental-health medication.

176.    Mr. Ford was attacked by another inmate and put into administrative segregation.

177.    Corrections officers left him in a cell with blood, feces, and urine in it without clothing or sheets.

178.    When Mr. Ford begged corrections officers to let him clean the cell or give him a blanket, they refused.

179.    Staff eventually brought Mr. Ford clothing when they came to confine him to a restraint chair. While restrained, the staff emptied a can of pepper spray in his face as he experienced a PTSD episode as a result of the jail's failure to provide his medication.

180.    Corrections staff did not properly decontaminate Mr. Ford, leaving him covered in pepper-spray residue.

181.    The jail held no one accountable.

182.    Mr. Ford requested video of these events, but Cuyahoga County has provided only a fraction of the video that should exist of his mistreatment.

183.    No one was held accountable for the missing video footage.

184.    The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

185.    The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

### Jail staff restrained, beat, and pepper sprayed Antoine Blackshear without legitimate reason to do so.

186.    Over the course of a single week in December 2018–January 2019, without any legitimate reason to do so, jail staff confined Antoine Blackshear to a restraint chair, beat him, and pepper sprayed him six times.

187.    Jail staff failed to adequately decontaminate Mr. Blackshear before releasing him.

188.    The jail held no one accountable.

189.    The jail has provided no video evidence of two of the attacks on Mr. Blackshear despite repeated public-records requests on his behalf.

190.    No one was held accountable for the missing video footage.

191.    The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

192.    The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

### Corrections staff pepper sprayed and restrained Margaret Jackintell, an elderly veteran with mental-health issues, for no reason.

193.    Margaret Jackintell is a 57-year old Navy veteran. She was booked into the county jail in December 2018.

194.    While incarcerated, she observed a corrections officer verbally abusing other incarcerated women. She voiced her disagreement with the way he was addressing them.

195.    Ms. Jackintell suffers from mental illness. As she sat calmly at a table in her pod, corrections staff took her to the ground and triggered an anxiety attack. Two guards saturated her with pepper spray before strapping her into a restraint chair.

196.    Jail staff left Ms. Jackintell in the restraint chair, covered in pepper spray, for approximately 10 hours and 15 minutes. During that time, she was denied food, water, or the opportunity to use the restroom facilities.

197.    For days after she was released from the chair, corrections staff refused to allow her to shower or clean herself.

198.    After she endured this abuse, Corporal Brad Bitterman repeatedly came to her cell to taunt her saying, e.g., "You're no fucking kind of veteran, you fucking bitch! I don't believe you're a veteran."

199.    The jail held no one accountable.

200.    Ms. Jackintell, through counsel, requested video of her time in custody. But the Defendant County did not provide surveillance video that should have existed of the attack and its aftermath, and produced body-worn camera video from only Corporal Brad Bitterman.

201.    No one was held accountable for the missing video footage.

202.    The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

203.    The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

### Corrections officers beat Terrence Debose while he was strapped into a restraint chair.

204.    On March 22, 2019, a corrections officer strapped Terrence Debose in a restraint chair in a small cell. Mr. Debose suffers from mental illness.

205.    While Mr. Debose was restrained, Corporal Nicholas Evans turned off his body-worn camera and repeatedly punched Mr. Debose in the face. Another corrections officer, Timothy Dugan, entered the room and joined in the abuse, punching Mr. Debose twice in the face.

206.    As a result of the attack, Mr. Debose suffered a concussion.

207.    Evans was indicted for felonious assault and Dugan was indicted for misdemeanor assault.

208.    The jail held no one accountable.

209.    The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

**Corrections officers pepper sprayed and physically abused Michael Roarty-Nugent when he asked for an extra milk during breakfast.**

210.    On April 4, 2019, Michael Roarty-Nugent asked the officer on breakfast rounds if he could have an extra milk. The officer at first agreed, but then changed her mind. She began to close the cell door on Mr. Roarty-Nugent's foot, and he instinctively protected himself by blocking the door with his arm. The officer then radioed SRT, claiming that he had somehow attempted to assault her.

211.    SRT officers responded to escort him to segregation and roughed him up as they walked him to the elevator. He remained compliant and cooperated in the transport process.

212.    Instead of going directly to segregation, the officers took Mr. Roarty-Nugent to another floor. When the elevator doors opened, several officers were waiting for him. He was compliant, and there was no excuse to use any force against him. The officers nevertheless handcuffed, pepper sprayed, and physically abused Mr. Roarty-Nugent, and then strapped him into a restraint chair.

213.    After deploying pepper foam, jail staff did not effectively decontaminate Mr. Roarty-Nugent. His breathing remained extremely labored and foam residue was visible on his face.

214.    He was kept in an isolation cell for several hours without water, a shower, new clothes, or access to a restroom. He was then taken to the hole, but was denied a shower, clean clothes, or sheets for several days. Mr. Roarty-Nugent spent 11 days in the hole.

215.    The jail held no one accountable.

216.    Mr. Roarty-Nugent requested video of these events, but Cuyahoga County claims that no surveillance video exists and has provided only limited, incomplete body-worn camera video.

217.    No one was held accountable for the missing video.

218.     The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

219.     The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

220.     On information and belief, there are incidents of excessive force and abuse by corrections officers—including retaliatory and punitive use of force, restraints, and pepper spray—in addition to those listed above.

221.     The County has a custom, policy, pattern, and practice of failing to use body-worn cameras to document incidents at the jail. Former warden Eric Ivey was indicted and pleaded guilty on charges stemming from his direction to corrections staff not to film certain incidents or encounters because the video could help people pursue civil lawsuits against the County.

222.     The County has a custom, policy, pattern, and practice of failing to preserve and maintain public records as required by law and consistent with the applicable records-retention schedule. The County destroyed public records depicting the incidents described above in violation of Ohio public-records law. The systematic and unauthorized deletion of jail surveillance video will permit corrections staff to misrepresent relevant facts regarding the systemic abuses perpetrated in the facility.

223.     In October 2019, Ohio Attorney General Dave Yost launched a criminal investigation into missing county records in the County's Sharepoint system, which is a document-sharing and storage platform. Certain documents previously known to be in that system have since been deleted, precluding review and examination of metadata that would reveal which employees accessed or otherwise interacted with records. The County defied a court order from Judge

Patricia Cosgrove in failing to preserve the records. The County also failed to preserve the records as required by the applicable records-retention schedule.

## CLAIM 1
### EIGHTH OR FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983 FOR A CUSTOM, POLICY, PATTERN, OR PRACTICE TOLERATING THE USE OF EXCESSIVE FORCE (AGAINST DEFENDANT CUYAHOGA COUNTY)[1]

224. Plaintiff incorporates all previous allegations.

225. Defendant Cuyahoga County permits, tolerates, and is deliberately indifferent to a pattern and practice of excessive force by its corrections officers at the jail. This widespread tolerance of excessive force by corrections officers constitutes a county policy, practice, pattern, or custom, and led to Mr. Glaze being attacked for no good reason.

226. The behavior that harmed Mr. Glaze is part of a recurring pattern of excessive force used on the people in custody at the county jail.

227. Corrections personnel failed to take basic, appropriate steps to protect Mr. Glaze from violence or to intervene when he was subjected to it.

228. Per the jail's written policies, use of force is supposed to be limited to instances of justifiable self-defense, prevention of self-inflicted harm, protection of others, prevention of riot, prevention of escape or other crimes and controlling or subduing an inmate who refuses to obey a staff command, and discharge of a firearm or other weapon. *See* Cuyahoga County Corrections Center Policy and Procedures, Use of Force (Response to Resistance), Policy No. 0002 (effective Jan. 1, 2016). But the jail regularly allows corrections officers to use force against inmates in other instances not listed in its written policies. Even when the jail does investigate or impose any

---

[1] At the relevant time, Mr. Glaze was either a convicted prisoner, subject to Eighth Amendment protection against excessive force, or a pretrial detainee, subject to Fourteenth Amendment protection against excessive force. He alleges his right to recover under both amendments, depending on what status the Court determines he had at the time in question.

sanction, it is typically nothing more than a slap on the wrist. Based on the totality of the circumstances—including the sheer number of use-of-force incidents and deployments of OC foam/pepper spray in instances where no use of force should have been permitted at all—the jail's actual policy is contrary to its written policy.

229.    The use of force is regularly used as a punishment or a form of discipline by corrections officers at the jail, including for when corrections personnel don't like what an incarcerated citizen has to say. And the County has time and again failed to appropriately discipline officers who engage in such tactics, resulting in a clear understanding among those incarcerated that they are subject to indiscriminate violence for any perceived slight or irritation they might inspire in an officer. Inmates justifiably fear being attacked by jail staff for no good reason.

230.    When corrections officers attack inmates using OC foam or pepper spray, staff intentionally fail to adequately decontaminate the targeted inmate to purposefully prolong his or her agony.

231.    On information and belief, Cuyahoga County intentionally failed to specify in its written policies how long a person sprayed with OC foam should be rinsed with water to effectively remove the burning residue from the skin, leading to the predictable result that staff would fail to effectively decontaminate pepper-sprayed inmates.

232.    Cuyahoga County's customs, policies, patterns, and practices have created a toxic culture that has desensitized its corrections personnel to brutal, sadistic violence at the jail because that violence is something wholly unremarkable. Corrections officers' savage and casual resort to violence is an ordinary aspect of jail culture that those incarcerated have learned to expect and that those responsible for overseeing the jail staff have fostered and tolerated.

233.    Based on previous instances of unjustified use of excessive force (some of which are described above), Defendant Cuyahoga County had notice of a pattern of constitutionally

offensive acts by its corrections officers but failed to take any remedial steps in response to the notice.

234. The culture of the punitive violence cultivated at the county jail was apparent to federal investigators who assessed the facility in October–November 2018.

235. According to the Quality Assurance Review of the Cuyahoga County Corrections Center (attached as Exhibit 1), the United States Marshals Service found the following deficiencies related to use of force:

> a. "Review of Use of Force (UOF) incidents determined staff are not utilizing all tools and techniques generally accepted as best practices for UOF teams to ensure staff and detainee safety (i.e., confrontation avoidance, UOF team concept, team briefings and debriefings, removing staff involved at the on-set of the incident from the immediate area, and a review of all UOF incidents by the agency administrator or designee, and medical assessment of all involved). Additionally, video tapes involving UOF are not tagged and labeled as evidence. Written reports are not required from all persons involved in the use of force or any staff who played a role in the incident (i.e., medical, correctional personnel, SRT, etc.)." *Id*. at 35.

> b. "Over 100 detainee/inmate interviews reveal strong and consistent allegation of brutality, UOF punishment, and cruel treatment at the hands of Security Response Team (SRT), whom the detainee/inmates refer to as "The Men in Black," based on their black para-military uniforms." *Id*.'

> c. "During the review, review team members observed SRT members verbally abusing and demonstrating aggressive behavior towards detainees/inmates; review of multiple UOF and SRT body-cam video reveal and contain aggressive conduct and behavior as well as abusive, explicit language used by SRT members directed at detainees/inmates." *Id*.

> d. "SRT members who were escorting detainee/inmates to be interviewed by Facility Review Team members were referring to requested detainee/inmates as "Snitches," as they escorted them to and from the interview location. The threatening, intimidating and aggressive behavior demonstrated and witnessed by the Facility Review Team resulted in the request to remove up to 10 detainee/inmates from the CCCC, for fear of SRT members retaliation, and the legitimate fear of detainee/inmate safety." *Id*.

236. By permitting, tolerating, and sanctioning a persistent and widespread policy, practice, pattern, and custom of corrections officers using excessive force against people in custody, under

which Mr. Glaze was victimized, Defendant Cuyahoga County deprived Mr. Glaze of rights,

remedies, privileges, and immunities guaranteed to every citizen of the United States.

237.    Because the County had for so long tolerated acts of indiscriminate and excessive violence

against people in its custody, Defendants Bodeker and Brown understood that they were

welcome to abuse Mr. Glaze (or anyone else) without fear of reprisal.

238.    In addition to the constant threat of punitive violence, Cuyahoga County's incarcerated

population also lives with deplorable conditions including acute overcrowding, lack of medical

care, inadequate nutrition and hygiene, vermin infestations, and a cascade of other horrific

conditions. The jail is a crucible of misery of which the County has been on notice and fully

aware for years. In a move calculated to inflict unnecessary suffering on the incarcerated

population, jail administration deliberately moved medical screenings from the intake area to

avoid having medical personnel observe and evaluate new arrivals in need of medical care

including mental-health and substance-abuse treatment. Despite its obligation to maintain

minimum standards under Ohio Administrative Code Chapter 5120:1-8 and the Federal

Performance-Based Detention Standards of the United States Department of Justice, the County

allowed the jail to devolve into abject squalor.

239.    In November 2018, several county judges wrote to jail administration about poor

conditions in the jail. One judge said, "The County's indifference to the dangers created by

failing to meet the needs of a very fragile and volatile prison population must end." Others

blasted the woefully inadequate medical care.

240.    The County's deliberate indifference to the needs of its inmate population and the

conditions under which they are forced to survive led directly to the deaths of nine inmates: on

June 10, 2018, Theodore Carter died at the jail from complications from cancer; on June 26,

2018, Esteban Parra died at the jail from an overdose; on July 3, 2018, Larry Johnson died at the

jail from suicide; on August 28, 2018, Jose Arquillo died at the jail from an overdose (former warden Eric Ivey would later be charged and plead guilty to charges stemming from his direction to a corrections officer to turn off his body camera during this incident); on August 30, 2018, Gregory Fox died at the jail from suicide; on August 31, 2018, Randall Rain died at the jail from suicide; on October 2, 2018, Allen Gomez Roman died at the jail from suicide; on December 30, 2018, Brandon Kiekisz died at the jail from suicide; and on May 10, 2019, Nicholas Colbert died at the jail from suicide.

241.    Despite its awareness of the overcrowding, understaffing, lack of adequate medical care, use of excessive force, destruction of video and other evidence, and other misconduct at the jail, Defendant Cuyahoga County has refused to mitigate this disaster.

242.    Conditions at the jail remain so atrocious to this day that the corrections officers filed to begin the process of changing the union that will represent them in collective-bargaining negotiations with the County. In September 2019, the corrections officers filed with the state to change their union from the Ohio Patrolmen's Benevolent Association to the Fraternal Order of Police. The officers cited involuntary overtime and unsafe working conditions (such as double- and quadruple-podding, leaving a single officer in charge of 100–200 inmates at a time) as some of the concerns prompting the change in their bargaining representative.

243.    The State of Ohio Department of Rehabilitation and Correction has also found serious deficiencies with the jail's conditions. Two separate inspections in 2019 revealed a combined 150 violations of state standards.

244.    Last year, specially appointed assistant Ohio attorneys general have indicted numerous current or former jail employees including the former director of regional corrections, the former warden, as well as supervisors and line corrections officers. The charges include violent crimes, drug crimes, dereliction of duty, and tampering with evidence, among others.

245.    Defendant Cuyahoga County tolerated and failed to prevent the incidents of excessive force against numerous incarcerated citizens including, but not limited to Mr. Glaze, Lucille Dumas, Joshua Castleberry, Blanche Hill, Chantelle Glass, Corrionne Lawrence, Glenn Mayer, Jr., Joseph Sawyer, Timothy Bennett, Tyrone Hipps, Jr., Jasper Muldrow, Daniel Ford, Jr., Antoine Blackshear, Margaret Jackintell, Terrence Debose, Michael Roarty-Nugent, and others.

246.    Despite the current sheriff making repeated admissions about the problems in the jail and the need to change the violent and abusive culture among the corrections staff, the Defendant County has not disciplined all of the corrections staff who have used excessive force against inmates, or held anyone in jail administration or County administration accountable for perpetrating the greatest human-rights crisis in this community's history. Nor has anyone been held to account for the mass deletion of jail surveillance videos that captured these horrific events as they unfolded.

247.    As a direct and proximate result of the Defendant County's unlawful conduct, Mr. Glaze suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

### CLAIM 2
### FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983 FOR DELIBERATE INDIFFERENCE/FAILURE TO TRAIN AND SUPERVISE CORRECTIONS OFFICERS (AGAINST DEFENDANT CUYAHOGA COUNTY)

248.    Plaintiff incorporates all previous allegations.

249.    Defendant Cuyahoga County permits, tolerates, and is deliberately indifferent to its failure to train and supervise corrections officers on how to interact with people in custody, including using force appropriately in a correctional setting and properly decontaminating those subjected to OC foam.

250.    Defendant Cuyahoga County failed to train and supervise its corrections officers on how to use the best use-of-force tactics to ensure the safety of incarcerated citizens. The behavior of Defendants Bodeker and Brown and the SRT officers that interacted with Mr. Glaze after the OC attack is consistent with a recurring pattern of how corrections officers interact with people in custody at the jail, due to a lack of training and accountability and a general tolerance for ignoring the humanity of the human beings in the jail.

251.    Defendant Cuyahoga County had notice of its failure to train and supervise its corrections personnel, which resulted in a pattern of constitutionally offensive acts by its corrections officers. Defendant County failed to take any remedial steps in response to the notice.

252.    The individual Defendants behaved this way because it was consistent with Defendant Cuyahoga County's culture of violence and abuse against the people detained in its jail.

253.    The County knew that it was not enforcing its written policies and that its corrections staff, including the individual Defendants, lacked relevant training. The County also knew that its chronic failure to adequately staff the jail while continuously marketing itself to take in more and more incarcerated population from Cleveland and the surrounding communities would lead to predictable disaster. Yet, it failed to take basic steps to mitigate the disaster it created.

254.    On information and belief, Defendant Cuyahoga County has, despite notice, tolerated and nurtured its corrections officers' violent and abusive conduct by failing to intervene and prevent abuse. The County was deliberately indifferent to the obligation to train corrections officers on how to behave.

255.    The County was deliberately indifferent to its obligation to preserve public records depicting the activities in the jail—including use-of-force incidents—that would prove that inmate allegations of misconduct are true. Instead, the County carried out mass deletion of jail surveillance footage and otherwise operated an insecure computer system that allowed individual

corrections personnel to fail to upload use-of-force videos captured on body-worn cameras, delete videos, rename videos, or transfer video files out of the system where they are customarily stored.

256.    As detailed above, Defendant Cuyahoga County tolerated and failed to prevent the incidents of excessive force against numerous incarcerated citizens, and failed to train its staff to preserve evidence of use-of-force incidents.

257.    According to the Quality Assurance Review of the Cuyahoga County Corrections Center, the United States Marshals Service found the following training deficiencies:

> a.    "Denial of detainees/inmates to perform hygiene, detainees/inmates are not allowed access to showers, telephones and recreation due to CCCC's implementation of a lockdown system known as "Red Zone." The "Red Zone" RHU detainees/inmates management system is used as a means to address insufficient staff and staffing shortages. Detainees/inmates housed in the "Red Zone" RHU are locked down for periods of 27 or more hours in their cells, additionally interviews with detainees/inmates in the "Red Zone" RHU are lockdown, along with inspection of their cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied access to razors or barbering." *Id*. at 4.

> b.    "There is no internal quality control plan in place to provide an annual review of CCCC's operations to ensure compliance to ensure compliance with CCCC's policies and procedures. CCCC is inspected annually by the Ohio Department of Rehabilitation and Corrections' Bureau of Adult Detention to determine compliance with the Ohio's Minimum Standards for Adult Detention Centers. The last inspection was on November 14, 2017; review of the November 14, 2017 previous inspection documentation reveal CCCC's staff did not comply, address or provide corrective actions for identified deficiencies which included: exceeding rated capacity, lack of natural lighting in housing units, and detainees/inmates not being provided with five hours a week of exercise. A corrective action plan to address the aforementioned identified deficiencies was not provided for review." *Id*. at 26.

> c.    "Sheriff's Deputies provide transportation and outside escort for detainees/inmates. Therefore, Correctional Officers do not carry firearms, nor do they receive specialized firearms training. Staff authorized to use chemical agents receive required training. A review of management and supervisory staff training files reveal management and supervisory staff receive 40 hours of management and supervisory training during their first year and only 8 hours annually as required by the Ohio Minimum Adult Detention Standards. FPBDS requires management and supervisory staff receive an initial 40 hours training the first year and 24 hours thereafter." *Id*. at 28-29.

    d. "There is no policy in place requiring notification to the agency of jurisdiction of serious incidents involving detainees/inmates. Additionally, no documentation was provided for review to support the practice of external agency notifications." *Id*. at 29.

    e. "Interview with staff reveal numerous staff at all levels express concerns for their safety and security due to staffing shortages; concerns were also expressed regarding morale and sense of inability to make changes or voice concerns to leadership or management." *Id*. at 29.

258. The casual resort to violence—in particular the use of pepper spray or OC foam—is something the corrections officers at the jail find so unremarkable and amusing that they actually joke about it on social media.

259. On January 7, 2019, Darriell Hayes was a corrections officer at the jail. On that date, he shared a Facebook post with a video of a "Scared Straight" style program. The thumbnail image shows a young boy approximately five-years old in prison garb and looking terrified. The post included the question, "An intervention program exposing kids to jail is raising questions for some. Do you think it goes too far?"

260. Katie Spragg, also a corrections officer at the jail, posted a public comment sharing her view (misspellings in original): "maybe im crazy but i dont think its enough they need a chair and pepper spray."

261. Hayes's Facebook post, with Spragg's comment, is below:



262.    On March 4, 2019, Hayes posted the following image saying, "I WILL NOW REFER

TO PEPPER SPRAY AS PEOPLE SEASONING IN MY REPORTS."



263.     Photographs of Hayes—including a selfie in his corrections-officer uniform—are clearly

visible in the screenshots from his public Facebook postings alongside the images he chose to

share with the world.

264.     Hayes remained a corrections officer at the jail until he resigned in August 2019. Spragg

is still on the job.

265.     These examples of corrections-officer social-media presence shed light on the twisted

vortex of misery in which they work. It takes a special kind of depravity to joke about pepper

spraying a kindergartener.

266.    By permitting, tolerating, and sanctioning a persistent and widespread custom, policy,

pattern, and practice of deliberate indifference to failing to train and supervise corrections

officers not to use excessive force, to provide medical care to people in distress, to permit access

to showers and food, and to generally follow its written policies rather than its actual abusive

customs, policies, patterns, and practices, Defendant Cuyahoga County deprived Mr. Glaze of

rights, remedies, privileges, and immunities guaranteed to every citizen of the United States.

267.    As a direct and proximate result of Defendant Cuyahoga County's unlawful conduct, Mr.

Glaze suffered and will continue to suffer economic and non-economic damages for which this

Defendant is liable, including, but not limited to, mental, emotional, and physical pain and

suffering.

## CLAIM 3
### EIGHTH OR FOURTEENTH AMENDMENT USE OF EXCESSIVE FORCE UNDER
### 42 U.S.C. § 1983
### (AGAINST DEFENDANTS BODEKER AND BROWN)

268.    Plaintiff incorporates all previous allegations.

269.    Defendants Bodeker and Brown purposefully and knowingly used objectively

unreasonable force against Mr. Glaze. The above-described use of force was unnecessary,

gratuitous, and objectively unreasonable, as was the failure to properly decontaminate him.

270.    All the facts and circumstances surrounding this incident cannot be viewed subjectively or

objectively to support any use of force, let alone the level of force that Defendants Bodeker and

Brown used.

271.    As a direct and proximate result of these Defendants' unlawful and sadistic conduct, Mr.

Glaze suffered and will continue to suffer economic and non-economic damages for which these

Defendants are liable, including, but not limited to, mental, emotional, and physical pain and

suffering.

272.    These Defendants' acts were willful, egregious, malicious, and worthy of substantial

sanction to punish and deter them and others from engaging in this type of unlawful conduct.

**CLAIM 4**
**CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE § 2307.60**
**(AGAINST DEFENDANTS BODEKER AND BROWN)**

273.    Plaintiff incorporates all previous allegations.

274.    The conduct complained of above constitutes criminal acts on the part of these

Defendants. The crimes include, but are not limited to,

    a.    felonious assault (Ohio Rev. Code § 2903.11(A)(1));

    b.    assault (Ohio Rev. Code § 2903.13(A));

    c.    interfering with civil rights (Ohio Rev. Code § 2921.45(A));

    d.    unlawful restraint (Ohio Rev. Code § 2905.03(A));

    e.    intimidation (Ohio Rev. Code § 2921.03(A));

    f.    dereliction of duty (Ohio Rev. Code § 2921.44(C)(2)).

275.    As a direct and proximate result of these Defendants' intentional, knowing, and

purposeful criminal conduct, which showed a spirit of ill-will, hatred, and wanton disregard of

Mr. Glaze's rights, Mr. Glaze has suffered and will continue to suffer economic and non-

economic damages for which these Defendants are liable, including, but not limited to mental,

emotional, and physical pain and suffering, as well as punitive damages.

276.    These Defendants' acts were willful, egregious, malicious, and worthy of substantial

sanction to punish and deter them and others from engaging in this type of unlawful conduct.

**CLAIM 5**
**RECKLESS HIRING, TRAINING, SUPERVISION, DISCIPLINE, STAFFING, AND**
**RETENTION (AGAINST DEFENDANT CUYAHOGA COUNTY)**

277.    Plaintiff incorporates all previous allegations.

278.     On information and belief, Defendant Cuyahoga County failed to exercise due care and acted in a reckless manner in hiring, training, supervising, disciplining, staffing, and retaining the individual Defendants, who were unfit for their positions and duties.

279.     On information and belief, Defendant Cuyahoga County failed to conduct appropriate background checks of applicants for jail positions and, had it done so, would have learned that the individual defendants and/or those who supervised or trained them were unfit for their positions.

280.     Defendant Cuyahoga County's reckless conduct in this regard proximately caused Mr. Glaze's injuries alleged above.

281.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Glaze sustained the damages alleged above.

### CLAIM 6
### DESTRUCTION OF PUBLIC RECORDS UNDER OHIO REV. CODE § 149.351
### (AGAINST DEFENDANT CUYAHOGA COUNTY)

282.     Plaintiff incorporates all previous allegations.

283.     Where Mr. Glaze was standing on November 27, 2017 at the time of the events described above—on the ninth floor of Jail 1—is within the view of at least one mounted surveillance camera. His transport from the ninth floor to the slop room on the sixth floor, then to the medical dispensary on the sixth floor, and then to the wait room on the seventh floor, was within view of numerous mounted surveillance cameras. His confinement in the restraint room was within view of at least one mounted surveillance camera. And his transport from the wait room back to a cell—where he was released from the restraint chair—was also within view of numerous mounted surveillance cameras.

284.     The video footage from the cameras within the jail are public records documenting the activities of the jail and its officials.

285.    Upon information and belief, Defendants Bodeker and Brown intentionally kept their body cameras in Buffering Mode to ensure it destroyed any footage of Defendant Bodeker attacking Mr. Glaze.

286.    Upon information and belief, SRT officers intentionally kept their body cameras in Buffering Mode to ensure it destroyed any footage of (1) Defendant Bodeker attacking Mr. Glaze and (2) the events while Mr. Glaze was in the restraint chair up to the time he was taken out of the wait room.

287.    Public records may not be removed, destroyed, mutilated, transferred, or otherwise damaged or disposed of except under a records-retention schedule approved by the county records commission, the state auditor, and the Ohio history connection (formerly the Ohio historical society).

288.    As of November 27, 2017 (the day Mr. Glaze was attacked), the County had no records-retention schedule that would permit the destruction of any surveillance or body-worn camera footage documenting the activities at the County jail described in this pleading. The County should thus have maintained all video depicting Mr. Glaze's movement within the jail, including footage of the individual Defendants' use of force on that date.

289.    As of November 26, 2019 (the day Mr. Glaze filed his complaint in this action), the County had no records-retention schedule that would permit the destruction of any surveillance or body-worn camera footage documenting the activities at the jail described in this pleading. The County should thus have maintained all video depicting Mr. Glaze's movement within the jail, including footage of the individual Defendants' use of force on that date.

290.    Under Ohio law, public records may be deleted only in accordance with an approved records-retention schedule.

291.    Because the County had no records-retention schedule authorizing the destruction of videos captured at the jail, it was obligated by law to keep those records indefinitely.

292.    In response to Mr. Glaze's request for the video footage of the attack on Mr. Glaze and its aftermath, the County claimed it had no surveillance videos and only limited body-camera videos.

293.    The footage from the various surveillance cameras that captured the attack on Mr. Glaze and its aftermath did not magically vanish into thin air. There is no reasonable explanation for why this footage—and the footage of so many other attacks on those in custody—allegedly no longer exists.

294.    The County produced two snippets of body-worn camera footage that appear to be altered. One of the videos, which appears to be from Defendant Bodeker's body-worn camera, suspiciously cuts off right after the pepper foam is deployed and does not show anything that happened afterward ("decontamination," transport to medical, transport to wait room, etc.).

295.    In the criminal trial over the abuse Joshua Castleberry endured, FBI agent Dennis Timony testified that he found evidence that jail videos had been destroyed.

296.    In August 2019, Idris-Farid Clark—who was already under indictment for the felonious assault of Chantelle Glass—was arrested and indicted for extortion of another corrections officer. According to the indictment, Clark offered to delete incriminating video of the other corrections officer's involvement in a use-of-force incident. Videos from the County's V drive were discovered on one or more of his personal devices via search warrant.

297.    In October 2019, special assistant attorneys general with the Ohio Attorney General's office discovered that the County had defied the court order and deleted documents regarding a County employee's ongoing corruption case. The deletion of those documents precludes a review

and examination of their metadata, which would reveal which County employees accessed the documents.

298.    The Ohio Attorney General's office has publicly acknowledged in a court filing that Cuyahoga County has a "past practice of removing body cam video from the Cuyahoga County jail server."

299.    On information and belief, employees at the jail can alter, delete, rename, download, or otherwise destroy or tamper with surveillance and body-camera videos and other public records at the jail.

300.    On information and belief, the County failed to preserve or destroyed the surveillance footage and body-camera footage of the attack on Mr. Glaze and its aftermath.

301.    Mr. Glaze is aggrieved by the destruction of the video evidence of the assault he suffered. Proving his civil claims, including his *Monell* claims, will be more challenging without the video depicting precisely what transpired.

302.    Mr. Glaze commences this civil action for injunctive relief to compel compliance with Ohio Rev. Code § 149.351(A), for his reasonable attorneys' fees incurred in this action, and for the civil forfeiture of $1,000 per violation for the destruction of the videos depicting the assault.

## PRAYER FOR RELIEF

For the reasons stated, Mr. Glaze respectfully requests the following relief from the Court:

A.    Declare that Defendants' acts and conduct constitute violations of the First and Fourteenth Amendments to the United States Constitution, as well as of 42 U.S.C. § 1983 and state law;

B.    Enter judgment in Mr. Glaze's favor on all claims for relief;

C.    Award full compensatory damages including, but not limited to, damages for pain and suffering, mental anguish, and emotional distress, that Mr. Glaze has suffered and is reasonably certain to suffer in the future;

D.   Award punitive and exemplary damages for the individual Defendants' egregious, willful, and malicious conduct;

E.   Award pre- and post-judgment interest at the highest lawful rate;

F.   Award Mr. Glaze his reasonable attorneys' fees and all other costs of suit;

G.   Enjoin Defendant Cuyahoga County from any further acts destroying public-records related to the events described in Mr. Glaze's complaint (including the specific directive to preserve all video footage captured at the jail until further notice);

H.   Award Mr. Glaze $1,000 per violation of Ohio Rev. Code § 149.351(A) for the County's destruction of the videos of the attack on Mr. Glaze and its aftermath; and

I.   Award all other relief in law or equity, including injunctive relief, to which Mr. Glaze is entitled and that the Court deems equitable, just, and proper.

### JURY DEMAND

Mr. Glaze demands a trial by jury on all issues within this complaint.

Respectfully submitted,

THE CHANDRA LAW FIRM LLC

*/s/ Ashlie Case Sletvold*
Ashlie Case Sletvold (Ohio Bar No. 0079477)
Subodh Chandra (Ohio Bar No. 0069233)
Brian Bardwell (Ohio Bar No. 0098423)
The Chandra Law Building
1265 W. 6th St., Ste. 400
Cleveland, Ohio 44113
216.578.1700 Phone
216.578.1800 Fax
Ashlie.Sletvold@ChandraLaw.com
Subodh.Chandra@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

*Attorneys for Plaintiff Chariell Glaze*